## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

-----------------------------------------------------------------X

ELENA MORAN

                                                     Civil Action No.

         *PLAINTIFF*

         v.

TRUSTEES OF THE UNIVERSITY
OF PENNSYLVANIA d/b/a HOSPITAL           COMPLAINT
OF THE UNIVERSITY OF PENNSYLVANIA,
PERELMAN SCHOOL OF MEDICINE AT     **JURY DEMANDED**
THE UNIVERSITY OF PENNSYLVANIA,
PAUL OJEDA and MAUREEN THEIS

         *DEFENDANTS*

-----------------------------------------------------------------X

Plaintiff, ELENA MORAN, by and through her attorneys, Derek Smith Law Group, PLLC, upon information and belief, complains against Defendants as follows:

## INTRODUCTION

1. Plaintiff ELENA MORAN, had a statutory and constitutional right to a workplace free from discrimination because of her race, color, and sex.

2. The Defendants has actual knowledge of the severe and pervasive sex-based harassment to which Plaintiff was subjected and created a hostile environment when they failed to appropriately address the harassment. By

acting with deliberate indifference to that knowledge, Defendants deprived Plaintiff of her Constitutional Rights in violation of Title VII of the Civil Rights Act of 1964 as more fully set forth herein. violation of 42 U.S.C. §1981, Title VII of the Civil Rights Act of 1964, as codified, 42 U.S.C. §§ 2000e to 2000e-17 (amended in 1972, 1978 and by the Civil Rights Act of 1991, Pub. L. No. 102-166 ("Title VII")), and to remedy violations of the Pennsylvania Human Relations Act, as amended, 43 P.S. §§ 951, *et. seq.* ("PHRA").

3. Plaintiffs also seeks to remedy violations of the laws of Pennsylvania State and Pennsylvania Common law to redress the injuries Plaintiffs have suffered as a result of being harassed and discriminated against on the basis of her sex/gender or making complaints about such discrimination.

## JURISDICTION AND VENUE

4. This Court has subject matter jurisdiction over this case pursuant to 28 U.S.C. §1331, 1343 and 2201, which gives district court's jurisdiction over all civil actions arising under the Constitution, laws, and treaties of the United States.

5. This court has jurisdiction in that this action involves a Federal Question.

6. This Court has supplemental jurisdiction under 28 U.S.C. §1367.

7. This Court also has subject matter jurisdiction pursuant to 28 U.S.C. § 1343, which gives district courts original jurisdiction over (a) any civil action

authorized by law to be brought by any person to redress the deprivation, under color of any State law, statute, ordinance, regulation, custom or usage, of any right, privilege or immunity secured by the Constitution of the United States or by any Act of Congress providing for equal rights of citizens or of all persons within the jurisdiction of the United States; and (b) any civil action to recover damages or to secure equitable relief under any Act of Congress providing for the protection of the civil rights.

8. Venue is proper in this district pursuant to 28 U.S.C. § 1391 (b), since Defendants are in this judicial district and all or a substantial part of the events which give rise to the claim herein occurred in this district. Defendants Trustees of the University of Pennsylvania is a domestic non-profit Corporation. Perelman School of Medicine is the Medical School for The University of Pennsylvania. Both University of Pennsylvania entities are located in Philadelphia, Pennsylvania.  Individual defendant Paul Ojeda at all times material was an employee of the University of Pennsylvania entities and was Plaintiff's Supervisor. It is believed that Ojeda is a resident of Pennsylvania. Defendant Maureen Theis all times material was an employee of The University of Pennsylvania entities and it is believed that she is a resident of Pennsylvania.

**PARTIES**

9. Plaintiff ELENA MORAN is an adult female.

10. At all times material, Plaintiff was a resident of the County Philadelphia, in the Commonwealth of Pennsylvania, in the Eastern District of Pennsylvania.

11. At all times material, Plaintiff was an employee of the Defendant, University of Pennsylvania .

12. Defendant Paul Ojeda is male and all times material, was an employee of the University of Pennsylvania Defendants and Plaintiff's Supervisor.

## APPLICABLE LAW AND POLICY

13. This is an action seeking damages to redress the injuries Plaintiff has suffered, and continues to suffer, as a result of unlawful employment discrimination and retaliation by Defendants against Plaintiff in violation of 42 U.S.C. §1981, Title VII of the Civil Rights Act of 1964, as codified, 42 U.S.C. §§ 2000e to 2000e-17 (amended in 1972, 1978 and by the Civil Rights Act of1991, Pub. L. No. 102-166 ("Title VII")), and to remedy violations of the Pennsylvania Human Relations Act, as amended, 43 P.S. §§ 951, *et. seq.* ("PHRA"). Plaintiff further seeks relief due the defendants, pattern, and practice of employmentdiscrimination, both intentional and systematic, on the basis of sex.

## EXHAUSTION OF ADMINISTRATIVE REMEDIES

14.  On November 5, 2020, Plaintiff dual-filed a Charge of Discrimination (Charge No. 530-2021-00554) with the Equal Employment Opportunity Commission ("EEOC") and The Pennsylvania Human Relations Commission.

15. Plaintiff received a Notice of Right to Sue from the EEOC on July 26, 2021, 2021, for her Charge of Discrimination. Plaintiff's claims under the Pennsylvania Human Relations Act ("PHRA") are still pending before Pennsylvania Human Relations Commission ("PHRC") because less than one year has elapsed since PHRC assumed jurisdiction over his charges. After one year, Plaintiff will seek leave to amend this complaint to assert his PHRA claims.

## STATEMENT OF FACTS

16.  Around January 9, 2017, The University of Pennsylvania Defendants hired Plaintiff to the position of Registered Nurse at PERELMAN SCHOOL OF MEDICINE located at 3400 Civic Center Blvd, Building 421, Philadelphia, PA 19104.

17.  Plaintiff remained employed until she was forced to resign on October 13, 2020, due to Defendant OJEDA'S inappropriate sexual advances, harassment and behavior.

18. On May 4, 2019, Charge Nurse Theis verbally assaulted the Plaintiff by. On or about May 7, 2019, Plaintiff reported to Supervisor OJEDA and Supervisor Kavanaugh that she had been harassed by Theis.

19.  OJEDA responded "There's nothing to do about it. It is not physical violence. It is not like she punched you in the face or anything."

20.  Plaintiff asked OJEDA what action he was going to take regarding her complaint, and he

said, "There's nothing to do" and gave Plaintiff three options: continue to  work with Theis, take an unpaid leave of absence, or begin the long process of transferring units. No action was ever taken to protect Plaintiff form the workplace harassment she received from Theis.

21. Plaintiff stated to Defendant OJEDA "Well clearly you do not care about my  well-being." OJEDA responded with, "Well sorry you feel that way." Plaintiff then  replied, "I am going to HR!" OJEDA responded threatening Plaintiff "Oh really, are  you? I wouldn't recommend that, HR will turn you around and send you right back!" and "It's  not like she punched you in the face there's nothing to do about it!"

22. Around May 8, 2019, Plaintiff filed a complaint with Human Resource  Representative Andrea Mathis about OJEDA'S disregard of Plaintiff's complaint of  harassment and discrimination that occurred on May 4, 2019, with Theis.

23. Plaintiff told Ms. Mathis that OJEDA "has a lot to hide" and is  angry with her for going to Human Resources. Plaintiff also told Ms. Mathis that OJEDA disregarded her multiple complaints regarding Theis and that he told  Plaintiff to "take a leave of absence" and not get paid or "continue to work with her."

24. Around May 21, 2019, OJEDA retaliated against Plaintiff for reporting him to Human Resources by targeting her with personnel write ups.  The University of Pennsylvania policy was after a third write up, the employee is terminated.

25. OJEDA submitted private text messages to Human Resources that were dated April 2019. that were from a group text that had  nothing to do with Plaintiff's harassment complaints and were taken out of context. Plaintiff  received her first written warning because of the private group text. However, none of the other  participants were given a written warning and Plaintiff was singled out by OJEDA in retaliation for her lodging her May 8th

complaint against OJEDA. Had these texts been a true violation of policy all participants would have been issued a written warning.

26. Around May 21, 2019, Ms. Mathis and Supervisor Mary Rogers called Plaintiff to inform her that Theis was found in violation of the harassment and/or discrimination policy against Plaintiff as a result of the May 4th incident.

27. During the conversation Ms. Mathis asked Plaintiff what she meant by when she said OJEDA "has a lot to hide."

28. Plaintiff disclosed in that conversation the sexual harassment and inappropriate things OJEDA has done which has created an uncomfortable hostile work environment.

29. One morning in late April 2019 OJEDA decided to comment on Plaintiff's necklace before change of a 12-hour night shift. OJEDA stated that he never noticed it before, asked to see it closer and told Plaintiff how he likes it. OJEDA then asked Plaintiff again "Can you get closer so I can see it better?'' Ojeda then asked "Does the locket on your necklace open? Can you open it? What do you keep in there?' OJEDA was looking at Plaintiff's breasts and was asking her to lean forward so that he could see down the front of her shirt. Plaintiff walked away very disturbed and uncomfortable.

30. Shortly after this incident Plaintiff reported to Human Resources that OJEDA intentionally created a circumstance in order for him to look down her shirt.

31. Around May 21, 2019, in the morning after Plaintiff has worked a night shift, OJEDA stated, "Not to sound like a creepy old guy but you ladies clean up real nice." Plaintiff reported this to Ms. Mathis and Ms. Rogers on a three-way call.

32. OJEDA'S Supervisor, Mary Rogers stated in response to Plaintiff's' complaint, "Well if you have to start a statement with not to sound like a creepy old guy, you already do." Plaintiff thought Ms. Rogers would address the comments in a formal manner and finally

stop the sexual harassment but they continued.

33.    Later that day, OJEDA commented on how Plaintiff looked in her scrubs. OJEDA told

Plaintiff that he liked her scrub skirt and that she "pulls it off

well." Plaintiff noticed another nurse, Nikki Haussman, was getting upset because of the

attention OJEDA was giving Plaintiff. Ms. Haussman began  to treat Plaintiff much

differently because of OJEDA'S comment which left Plaintiff  feeling uncomfortable

when working with  Haussman because of her  hostile treatment.

34.    OJEDA had been inappropriate with Ms. Hausmann on numerous occasions at the nurses'

station and Plaintiff believes that is why Ms. Hausman began to treat her differently. For

example, OJEDA had licked frosting off of Hausman's fingers and caressed her arm at the

Nurses Station in front of multiple staff members. The behavior made the Staff

uncomfortable.

35.    Around December 2019, one of Plaintiff's patients had a rapid response.  Plaintiff asked

OJEDA to move as he was blocking her path to the patient.  OJEDA did not move out of

the way and instead stood in front of a sink and forced  Plaintiff to squeeze in between

him and the patient's bed. OJEDA intentionally grabbed Plaintiff's buttocks as she moved

past him.

36.    Plaintiff reported this assault to Human Resources. She further reported that there is

favoritism to nurses that give in to OJEDA'S flirting. For example, if you deny or  defy

OJEDA's advances, you will be ignored and retaliated against and will not be selected

to  precept or be selected  a Charge RN. Plaintiff was never offered to precept or be a

Charge RN because she would not succumb to OJEDA'S sexual advances and

offensive behavior.

37.     OJEDA'S inappropriate behavior with staff continued. OJEDA would feed food to a

certain nurse, licking his arm and wiping it on the nurse's arm, and they both would

disappear with the door closed for hours.

38.   Around May 24, 2019, Plaintiff emailed Chief Human Resources Officer Denise Mariotti

in UPHS Corporate, Human Resources Manager Leonard Umile, and Mary Rogers

Director of Surgical and Neurosurgical Nursing who is also OJEDA'S Supervisor.

Plaintiff was terrified of OJEDA's intimidation and requested that Human Resources take

action to stop the sexual harassment and sexual touching of Ojeda. Plaintiff never received

a reply to her complaint.

39.   Around May 26, 2019, Plaintiff emailed the Director of Ethics, Aliza M. Narva, JD, RN.

Plaintiff also sent another email to Human Resources requesting that a representative (a

male) to be with Plaintiff during the disciplinary meeting with Defendant OJEDA in light

of all the sexual harassment. Ojeda claimed that this meeting concerned the first written

warning of the Plaintiff. Plaintiff's request was denied.

40.   Around May 30, 2019, Plaintiff received an email from Mr. Narva regarding her May 26,

2019, email. His response was as follows:

> To:
> * Moran, Elena
> Hi Elena,
>
> Thank you for your email.  It sounds like you have really gone through a difficult time and are struggling to feel like you are in a work environment that is right for you.  I'm getting from you that you're really frustrated and feel unable to find a good solution.  Many parts of this are outside your control, but one thing that you can control is your behavior and response and I encourage you to continue acting with civility and professionalism.  I am happy to talk on the phone if you want to discuss your feelings about this ongoing situation.  I wonder if you would feel more comfortable working in a different setting.  If the situation resolves and you are still not happy in this environment and are not able to change it, I would encourage you to consider looking to another unit. **You have escalated this issue through multiple avenues and I applaud you for taking action.**

41.   Around June 1, 2019,  Plaintiff was retaliated against again by OJEDA. Plaintiff received

a write up for a private text message that OJEDA turned into Human Resources. OJEDA

alleged that Plaintiff was in violation of workplace violence and three other policies

because of an old text message.

42.   Plaintiff refused to sign the document that OJEDA presented to her which would have admitted that plaintiff acted inappropriately. OJEDA was annoyed and upset that Plaintiff refused to  cave into his blatant retaliatory behavior. Plaintiff questioned the appeal process and was told  by OJEDA "Just take it up the chain of command."

43.   Around June 2, 2019, Plaintiff reported to Human Resources the sexual  harassment, and offensive text messages sent to her by Theis. In addition, Plaintiff  submitted a  First Request for Administrative Review Letter to Ms. Rogers concerning  OJEDA'S retaliatory write up.

44.   Around June 3, 2019, Plaintiff reported to Human Resources the discrimination  and unfair/unsafe treatment of patients due to their race by Theis. Plaintiff  reported that Theis used derogatory language towards the patients. Theis        would speak at the nurse's station about how she grew up in a racist household that disliked  people of color. This racist behavior and language are the type that perpetuates institutional racism  within healthcare and Plaintiff was compelled to report the behavior.

45.   Around June 4, 2019, Plaintiff received a call from Human Resources and was warned that Plaintiff was walking a thin line and could be written up for Retaliating against Theis.

46.   Plaintiff gave specific examples of OJEDA'S inappropriate  behavior with another nurse at the nurse's station which had been occurring for a year that created a hostile work environment for many nurses. Plaintiff further reported that no one spoke up to address it out of fear of OJEDA, especially after witnessing the retaliation being imposed on Plaintiff which stemmed from her  reporting his behavior.

47.   Plaintiff reported to Human Resources that one of nurses admitted that she had  sexual relations with OJEDA. This subject had been a topic of conversation on floor

RAVDIN9 at nearly every shift for at least eight months.

48.   Plaintiff also reported OJEDA'S unfair bias and favoritism to the nurse that he was having sex with, in the hospital during work hours. Plaintiff also stated that this nurse was hungover at the nurses' station and was not disciplined like previous nurses for this same violation because Ojeda was having sex with her.

49.   Thereafter, Plaintiff reported that two nurses found out that each were having sex with OJEDA during the same period of time and the work environment became extremely hostile because the two nurses were jealous of each other.

50.   Around May 4, 2020, Clamant reported to Human Resources, that OJEDA was ignoring his duties because he was in the office with the door closed with Nurse Nikki H. for 45 minutes 6:00 am-6:45 am.

51.   Around June 9, 2020, Plaintiff had her first meeting with Ms. Rogers in her Dulles office to dispute the first write up by OJEDA and against Plaintiff.

52.   After the meeting OJEDA was in the hallway waiting for Plaintiff to further intimidate her. Plaintiff reported this intimidation the next day.

53.   Around June 12, 2020, Plaintiff reported by email to Ms. Rogers that she was scared to work with THEIS. Ms. Rogers replied "It should be fine if you do your nursing work you pride yourself in." Plaintiff also sent a text to OJEDA to see if she could work with another charge nurse, but OJEDA denied her request.

54.   Around July 12, 2020, OJEDA again retaliated against Plaintiff by rearranging Plaintiff's schedule to work weekends. Plaintiff was forced to ask the scheduler to correct her work schedule. OJEDA became aware that a co-worker was exposed to COVID-19 when she was in Miami, but he did not report this exposure. OJEDA than called Plaintiff on the telephone under the guise of investigating gossip occurring during a night shift.

55.   Plaintiff cooperated in the investigation and told OJEDA what she had overheard. Ojeda then took this information and reported Plaintiff for the inappropriate behavior that he was investigating.

56.   Around July 25, 2020, Plaintiff was over assigned patients for care and was given heavy assignments for four days in a row, the policy is only two consecutive days. This was another form of retaliation by OJEDA.

57.   Around August 17, 2020, OJEDA texted Plaintiff to come to his office. Plaintiff had completed three consecutive night shifts. Plaintiff became upset that she would have to face her harasser in a private location and went to the restroom and threw up.

58.   Plaintiff arrived at his office and was told the meeting was to clean up some old Human Resources issues. OJEDA lied. The meeting was to accuse Plaintiff of further gossiping charges. This second warning prevented Plaintiff from transferring out of OJEDA'S unit and took away Plaintiff's Graduate School Benefit, while she was in the middle of graduate school.

59.   Due to the second allegation of gossip, Plaintiff was required to repay the tuition that had been previously paid on her behalf in the amount of $16,000.00.

60.   Around September 11, 2020, Plaintiff met with Chief Nursing Officer Paul Harrington to dispute the two ridiculous write ups by OJEDA that cost Plaintiff her tuition benefit and ability to transfer.

61.   Plaintiff told Mr. Harrington about the conduct and statements of OJEDA and Mr. Harrington agree that it was sexual harassment and that he would conduct his own investigation. He had the power to veto the write ups, allow Plaintiff to transfer units and to continue Graduate School with the tuition benefit plan. Despite Harrington's admission that OJEDA was sexually harassing Plaintiff, he denied Moran's appeal.

62. Around October 3, 2020, Plaintiff was told by another nurse that she had worked with OJEDA and that "he is a pig." OJEDA exposed himself to this nurse while working at the Cardiovascular ICU. She further stated that she felt bad for all the young girls on his unit because he is a "predator."

63. Around October 8, 2020, OJEDA gave Plaintiff her annual review and rated her a 2.88. Anything rating below a 3.0 prevents advancement and pay raises. OJEDA then informed Plaintiff that he is launching another investigation into her conduct. OJEDA accused Plaintiff of going to Human Resources too many times about him and he was getting even.

64. Around October 13, 2020, Plaintiff intentionally started changing where she sat. Plaintiff wanted to be certain that OJEDA could not sit next to her. She therefore sat in the middle seat, protected between other nurses.

65. At 6:30 a.m. on October 13, 2020, OJEDA waited for the other nurses to leave, slid beside Plaintiff and whispered, "We are meeting this morning." Plaintiff replied, "No we are not meeting!" OJEDA got an angry and stated, "What do you mean, No?"

66. Around 7:00 a.m. Plaintiff, due to the hostile work environment created by THEIS and OJEDA, in conjunction with the complete lack of care or concern for her emotional, physical and workplace safety, handed in her letter of resignation in OJEDA'S office with Melissa Kavanaugh, CNS as a witness. OJEDA opened the letter and accepted Plaintiff's resignation with a smirk and a wink. Plaintiff was constructively discharged due to all Defendants disregard for Plaintiff's complaints of sexual harassment and hostile workplace

67. Plaintiff told OJEDA she would also email him a copy of her resignation letter Despite Plaintiff's resignation, OJEDA demanded that they meet again.

68.   OJEDA demanded that they must meet for one of the many private  investigations he has launched since Plaintiff reported sexual harassment to Human Resources in  May 2019, despite her resignation.

69.   Around October 13, 2020, Plaintiff was forced to resign as Clinical Nurse II due  to relentless retaliation by her nurse manager, OJEDA for exposing his sexual  harassment towards Plaintiff and his unprofessional behavior in front of all staff.

70.   Plaintiff was required to give two weeks' notice and did so even though she  would have to face OJEDA'S relentless, unfair, discriminatory, and spiteful  retaliation toward Plaintiff.

71.   OJEDA used relentless intimidation to force Plaintiff into multiple  disciplinary meetings including the one on October 13, 2020, after Plaintiff turned in her resignation.

72.   Retaliation stemmed from Plaintiff reporting OJEDA'S sexual  harassing her to Human Resources and OJEDA'S Supervisor, Ms. Rogers. Plaintiff reported  his inappropriate behavior with another nurse that he displayed for a year in front of all staff at  the nurses' station which made many employees uncomfortable.

73.   Plaintiff went into the break room and hid from OJEDA. Plaintiff called Human Resources but there was no answer. She therefore emailed Human Resources to report that OJEDA was insisting on a meeting after her  resignation.

74.   Plaintiff finally left the break room and OJEDA was waiting in  hiding. He followed Plaintiff into the conference room to which Plaintiff said, "I want to  leave."

75.   OJEDA announced that he is doing an "Annual Eval" which could  not possibly be true since Plaintiff already had her evaluation and had resigned.  OJEDA was incredibly angry, and Plaintiff was frightened. He proceeds to read a final warning  that states

Plaintiff failed to provide private text messages to him.  Plaintiff stated, "I resigned  you can't issue me a final warning it's counterproductive I will not be here to proceed through any progressive steps or discipline." OJEDA replied, "Human Resources said I can because I began my investigation before you resigned."

76.  Plaintiff gathered her belongings and a co-worker escorted Plaintiff out of the conference room because OJEDA was hunting her.

77.  Around 7:49 a.m. Plaintiff called Human Resources and emailed Ms. Mathis. At  7:51 a.m., Plaintiff called Mr. Umile who is Ms. Mathis's boss and Mr. Umile told Plaintiff that she should not go back when there's animosity on both ends like this.

78.  At 8:02 a.m. Plaintiff's co-worker, Dominique Brennan RN was working on  RAVDIN9 and texted Plaintiff "Ask Human Resources if you even have to go back, he [OJEDA]  is running the halls like he is on a war path right now."

79.  At 8:07 a.m. Plaintiff tried calling Ms. Mathis, but there was no answer.

80.  At 11:42 a.m. Plaintiff emailed Ms. Rogers begging her to tell OJEDA to leave Plaintiff alone and let her work the final two weeks in peace.

81.  At 4:11p.m. OJEDA called Plaintiff and left a voicemail asking  Plaintiff to call him back because he would like to discuss her letter of resignation.

82.  Around October 15, 2020, at 8:49 a.m. Plaintiff emailed OJEDA  "Paul, what would you like to discuss about my resignation letter?''

83.  OJEDA emailed a reply for Plaintiff to call him. Plaintiff was terrified  of OJEDA and went to her parents' house because OJEDA knows her  h o m e   address and Plaintiff was afraid of him.

84.  Plaintiff reviewed her schedule and learned that OJEDA had removed  her from her final shifts. She was prevented from saying goodbye to her co-workers and attending  a going

away party that was planned for her at work.

85.   At 4:40 p.m. Plaintiff contacted Mr. Umile and asked, "Why do you think Paul is calling, what does he want?" Mr. Umile told Plaintiff that she probably should not return to work and then asked why Plaintiff would want to return anyway. Plaintiff responded, "I have worked beside some of these people for years, they are throwing me a going away party, I want to say goodbye, and the unit is short staffed."

86.   Plaintiff emailed Mr. Umile again and asked to be compensated for the remaining shifts. Mr. Umile stated that he will advise Ms. Mathis to tell OJEDA to pay Plaintiff for October 21, October 23, and October 24.

87.   Around October 21, 2020, Plaintiff was not on the assignment or scheduled to work as she was taken off the last schedule. Nevertheless, at 7:20 p.m. she began receiving call from the RAVDIN9 charge phone.

88.   At 7:21 p.m. a text came through on the RAVDIN9 charge phone, it was OJEDA.

89.   OJEDA stated, "Hey Elena, I was calling to see if you are on your way in?" There were 4 more missed calls from RAVDIN9's charge phone but no voicemails were left, and Plaintiff did not receive any emails from work.

90.   At 10:00 p.m. OJEDA sent the Philadelphia Police to Plaintiff's home and reported that Plaintiff was last seen as suicidal on social media which was a false **and bogu**s report. Plaintiff was at the eye doctor all afternoon and grocery shopping she had not been on social media.

91.   Defendants discriminated against Plaintiff because of her sex/gender and in retaliation for reporting and opposing OJEDA'S unlawful conduct in the workplace.

92. Defendants failed to take any remedial action or corrective action against OJEDA.

93. As a result of their failures, Defendants enabled the continued sexual harassment of Plaintiff by OJEDA.

94. As a result of Defendants' actions, Plaintiff was degraded, humiliated, victimized, embarrassed and emotionally distressed. Plaintiff experienced physical effects related to the emotional distress to which Plaintiff suffered as a result of Defendants' discrimination, harassment, hostile work environment and retaliation, including severe anxiety and near-fainting/black-out.

95. As a result of the acts and conduct complained herein, Plaintiff has suffered and will continue to suffer the loss of income, the loss of salary, bonuses, benefits, and other compensation which such employment entails, and Plaintiff also suffered future pecuniary losses, emotional pain, humiliation, suffering, inconvenience, loss of enjoyment of life, and other non-pecuniary losses.

96. As Defendants' conduct has been malicious, willful, outrageous, and conducted with full knowledge of the law, Plaintiff demands Punitive Damages as against all the Defendants, jointly and severally.

97. Plaintiff claims a continuous practice of discrimination and claims a continuing violation and makes all claims herein under the continuing violations doctrine.

98. Plaintiff claims that s unlawfully discriminated against her because of her sex/gender, her report of sexual harassment and hostile work environment, and because she complained or opposed the unlawful conduct of Defendants related to the aforementioned protected classes.

99.   Plaintiff claims constructive and/or actual discharge, and also seeks reinstatement.

100.  Plaintiff further claims aggravation, activations, and/or exacerbation of her PTSD and any preexisting condition.

101.  Plaintiff claims alternatively (in the event Defendants claim so or that the Court determines) that Plaintiff is an Independent Contractor, and Plaintiff makes all applicable claims for the above conduct and facts under the applicable law pertaining to Independent Contractors.

102.  Defendants have established a pattern and practice of not only discrimination but also retaliation.

103.  The above are just some examples of some of the unlawful discrimination and retaliation to which Defendants subjected Plaintiff.

104.  Plaintiff claims that Defendants unlawfully discriminated against and terminated Plaintiff because of her sex/gender and color/race because she complained of and opposed the unlawful conduct of Defendants related to the above protected class.

105.  Plaintiff claims constructive and/or actual discharge and seeks reinstatement.

106.  Plaintiff claims a continuous practice of discrimination and claims a continuing violation and makes all claims herein under the continuing violations doctrine.

## FIRST COUNT
## FOR DISCRIMINATION UNDER TITLE VII
## AGAINST DEFENDANTS

107.   Plaintiff repeats and realleges each and every allegation made in the above paragraphs of this complaint.

108.   Title VII states in relevant parts as follows: § 2000e-2. [Section 703](a) Employer Practices It shall be an unlawful employment practice for an employer – (1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to her compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin."

109.   Defendants engaged in unlawful employment practices prohibited by 42 U.S.C. § 2000e et seq., by discriminating against Plaintiff because of his race and color.

## SECOND COUNT
## FOR DISCRIMINATION UNDER TITLE VII
## AGAINST DEFENDANTS

110.   Plaintiff repeats and realleges each and every allegation made in the above paragraphs of this complaint.

111.   Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. $2000e-3(a) provides that it shall be unlawful employment practice for an employer:

112.   "(1) to … discriminate against any of his employees … because [s]he has opposed any practice made an unlawful employment practice by this subchapter, or because [s]he has made a charge, testified, assisted or participated in any manner in an investigation, proceeding, or hearing under this subchapter."

113.   Defendants, retaliated against Plaintiff because she opposed and reported Defendants' unlawful employment practices.

**THIRD COUNT**
**FOR DISCRIMINATION**
**UNDER STATE LAW**
**AGAINST DEFENDANTS**

114.   Plaintiff repeats and realleges each and every allegation made in the above paragraphs of this complaint.

115.   The PHRA § 955 provides that  it shall be an unlawful discriminatory practice: "(a) For any employer because of the race, color, religious creed, ancestry, age, sex, national origin or non-job related handicap or disability or the use of a guide or support animal because of the blindness, deafness or physical handicap of any individual or independent contractor, to refuse to hire or employ or contract with, or to bar or to discharge from employment such individual or independent contractor, or to otherwise discriminate against such individual or independent contractor with respect to compensation, hire, tenure, terms, conditions or privileges of employment or contract, if the individual or independent contractor is the best able and most competent to perform the services required."

116.   Defendants engaged in an unlawful discriminatory practice by discriminating against the Plaintiff because of her race and color.

117.   Plaintiff hereby states her claim against Defendants under all of the applicable paragraphs of the PHRA § 955.

118. Defendants engaged in an unlawful discriminatory practice by discharging, retaliating, and otherwise discriminating against the Plaintiff because of Plaintiff's opposition to the unlawful employment practices of his employer.

**FOURTH COUNT**
**FOR AIDING & ABETTING**
**UNDER STATE LAW**
**AGAINST DEFENDANTS**

119. Plaintiff repeats and realleges each and every allegation made in the above paragraphs of  this complaint.

120. PHRA § 955(e) provides that it shall be an unlawful discriminatory practice: " For any person, employer, employment agency, labor organization or employee, to aid, abet, incite, compel or coerce the doing of any act declared by this section to be an unlawful discriminatory practice, or to obstruct or prevent any person from complying with the provisions of this act or any order issued thereunder, or to attempt, directly or indirectly, to commit any act declared by this section to be an unlawful discriminatory practice."

121. Defendants engaged in an unlawful discriminatory practice in violation of PHRA §955(e) by aiding, abetting, inciting, compelling, and coercing the discriminatory conduct.

**FIFTH COUNT**
**Hostile Work Environment and Harassment**
**Civil Rights Act of 1964, 42 U.S.C. §2000e et. seq.**
**AGAINST DEFENDANTS**

122. Plaintiff incorporates by refence the foregoing paragraphs as if set forth at length herein.

123. Defendants are an employer under 42 U.S.C. §2000 et seq as they engage in an industry affecting commerce and have 15 or more employees for each working day of 20 or more calendar weeks in the current or preceding calendar year.

124. Plaintiff is a person and has a protected class in being African American.

125. Under 42 U.S.C.§2000e-2 it shall be unlawful employment practice for an employer to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex or national origin.

126. Defendant by and through Plaintiff's supervisors made remarks about Plaintiff, treated Plaintiff disparately by way of conduct motivated by discriminatory animus as set forth in the Material Facts which have been incorporated into this Cause of Action.

127. The disparate treatment was clearly discriminatory based upon race and color.

128. The disparate treatment caused a hostile work environment for Plaintiff as the treatment had an actionable impact on Plaintiff's ability to work.

129. Plaintiff's complaints about his treatment were reported to his supervisors and in accordance with the Defendants procedures.

130. Defendant failed to address Plaintiff's complaints of discrimination fairly and properly.

131. As a direct and proximate result of Defendant's discrimination, Plaintiff has suffered loss of wages including loss of back pay, loss of front pay, loss of amenities of employment, out of pocket expenses, emotional damages, pain and suffering, alienation, loss of confidence, loss of reputation, and other similar damages and harms, all to Stone's great detriment.

132.    Defendant's actions were willful and wanton and thus require imposition of Punitive

Damages.

## SIXTH COUNT
## DISPARATE TREATMENT
## CIVIL RIGHTS ACT OF 1964, 42 U.S.C.§2000e et. seq.
## AGAINST DEFENDANTS

133.    Plaintiff incorporates by reference the foregoing paragraphs as set forth at length herein.

134.    Defendants discriminated and disparately treated Plaintiff, by and through its officers,

managers, and supervisors as follows:

a.    Disparate discipline.

b.    Disparate scheduling.

c.    Disparate training and pay.

d.    Constructive discharge

e.    Disparate criticism of work performance where similarly situated non-African

Americans were not subject to the same, and

f.    Other treatment that was wrongful and disparate on the base of race/color.

135.    As a direct and proximate result of Defendants discrimination, Plaintiff has suffered loss

of wages including loss of back pay, loss of front pay, loss of amenities of employment,

out of pocket expenses, emotional damages, pain and suffering, alienation, loss of

confidence, loss of reputation, and other similar damages and harms, all to Plaintiff's

great detriment.

136.   Defendants, actions were willful and wanton and thus require imposition of Punitive Damages.

137.   Alternatively, as Defendants considered Plaintiff 's race in the foregoing discrimination, Plaintiff is entitled to a charge of mixed-motive discrimination, which entitles Plaintiff to an award of Attorney's fees.

**SEVENTH COUNT**
**RETALIATION**
**Civil Rights Act of 1964, 42 U.S.C.§200e et. seq.**
**AGAINST DEFENDANTS**

138.    Plaintiff incorporates the foregoing paragraphs as if set forth at length herein.

139.   Defendant DEFENDANTS retaliated against Plaintiff for making a complaint of discrimination.

140.   The temporal proximity between Plaintiff's complaint and termination raises an inference that the termination was retaliation, such that no further evidence of retaliation is necessary.

141.   As a direct and proximate cause of Defendant's discrimination, Plaintiff suffered loss of wages including loss of back pay, loss of front pay, loss of amenities of employment, out of pocket expenses, emotional damages and harms, all of Plaintiff's great detriment.

142.   Defendants' actions were willful and wanton and thus require the imposition of Punitive Damages.

143.   Defendants considered Plaintiff's protected class in deciding to disparately treat and/or terminate Plaintiff resulting in mixed-motive discrimination/retaliation, which entitles Plaintiff to an award of attorney's fees.

**EIGHTH COUNT**
**Discrimination, Disparate Treatment, Hostile Work Environment, Retaliation**
**Pennsylvania Human Relations Act, 43 P.S. §951 et. seq.**
**AGAINST ALL DEFENDANTS**

144.    Plaintiff incorporates the foregoing paragraphs as if set forth at length herein.

145.    Defendant DEFENDANTS is an employer under the Pennsylvania Human Relations Act as it employs citizens of the Commonwealth of Pennsylvania and because Defendant DEFENDANTS resides in Pennsylvania.

146.    Plaintiff is protected under the Pennsylvania Human Relations Act and has the protected class of being African American (race) and color (black).

147.    Defendant subjected Plaintiff to harassing, hostile work environment, disparately treated Stone, retaliated against Plaintiff and otherwise discriminated against Plaintiff, all on the basis of race and color as alleged.

148.    As a direct and proximate cause of Defendant's discrimination, Plaintiff has suffered loss of wages including loss of back pay, loss of front pay, loss of amenities of employment, out of pocket expenses, emotional damages, pain and suffering, alienation, loss of confidence, loss of reputation, and other similar damages and harm, all to Stone's great detriment.

149.    Plaintiff seeks attorney's fees under the Pennsylvania Human Relations Act.

**NINTH COUNT**
**Vicarious Liability**
**AGAINST DEFENDANT**

82.    At all times material, Defendant employed all other individual Defendants named in this matter.  D is vicariously liable for all of the actions of the individual Defendants as well

as any other employees who may have contributed to the harm caused by the discrimination hereinbefore

## JURY DEMAND

Plaintiff requests a jury trial on all issues to be tried.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff demands judgment against Defendants, jointly, severally, or in the alternative in an amount to be determined at the time of trial plus interest, including but not limited to all emotional distress and back pay and front pay, punitive damages, liquidated damages, statutory damages, attorneys' fees, costs, and disbursements of action; and for such other relief as the Court deems just and proper.

Date: August 13, 2021 **DEREK SMITH LAW GROUP, PLLC**

By: _____
Scott E. Diamond, Esq.
1835 Market Street, Suite 2950
Philadelphia, Pennsylvania 19103
Phone: (215) 391-4790
scott@dereksmithlaw.com
*Attorneys for Plaintiff*